On behalf of the Avalon, Mr. Matthew M. Seifard, on behalf of the Avaline, Ms. Joan Prickett. Mr. Seifard. Good morning. Good morning. May it please the court. My name is Matthew Seifard, I represent the Avalon, Ms. Gonzalez-Reyes. I will be requesting five minutes for reply. Can you pull that up so that we can hear you a little better? Absolutely. Thank you. I will be requesting five minutes for reply in this matter. May it please the court. At this time, personal rights are very forefront in our media, in our laws. And the Supreme Court rulings have come down. And I assume that every generation believes that the issues of rights are always something that we are fighting. Issues for the right to a jury trial. Rights against unreasonable search and seizures. The right to even remain silent during interrogations. But for my purposes, the most important right that I need to look at is the right to a fair trial. And not just the appearance of a fair trial. On November 20, 2011. How are you submitting your client didn't get a fair trial? At pretty much every turn in the road, evidence was hidden, tampered with, or not disclosed. Those were motions, a lot of that dealt with issues that happened before the trial. We're not specifically, you're not alleging that the trial was rife with trial court erroneous rulings. You've challenged a motion to inspect the car. You've challenged a search and seizure. You've challenged a statement. Those related to incidents before the trial, correct? As well as that trial, your honors. The first point I would issue is the statements made by detectives at trial. Saying that there was an initial statement made by my client that he had been at a quinceanera. That some family member had provided him with cocaine he wished to sell. That test statement was never offered. Appellees in their response state clearly on page seven that they said that he found it in his initial statement. That's what they testified to in the preliminary hearing. The detectives always said that they said that there's no cocaine ferry that drops drugs in your lap. That was his statement. We didn't believe him. He gave another statement. At trial, they gave a completely different statement saying there's a quinceanera. And whatever the initial statement is, which we still don't know based on all of the contradictory statements, was clearly exculpatory based on the argument of the state's attorney at trial. Who argued that he shouldn't be able to answer the question because the initial statement was exculpatory. I don't want to throw you off your stride, but you've raised a number of distinct, discrete, finite issues. So why don't you take it chronologically. Okay. And deal with the ones you think are the most significant. I think the most important is Brady in dealing with these statements. In a statement based on the initial statement, which all the records show is that he did make an initial statement. The detectives say he made an initial statement. They didn't do anything about it. They said one of them was taking notes. They destroyed their notes. They said so they don't have to turn them over. They said based on statute, because it's a non-felony, they're not required to keep their notes. However, Supreme Court Rule 412 says at least you have to give me a summary of what was said in that statement. So that at trial, we can't change it. I don't have the ability to impeach them based on the original statement. So what happened here, just to everybody's benefit, is the police officers typically take notes. Yes. Of the interview of the defendant. Those notes are then later put into a formal police report. And in this case, they destroyed the preliminary notes. Yes. Do you have anything? Was there any threshold showing that the notes would have been favorable to the defendant? I would say the state's attorney's argument at trial that says it was exculpatory, that's why he can't answer the question. In the police report, they said nothing other than he made an initial statement. At trial, and it's in the reply, when I asked the detectives on the stand what the initial statement was, the state explicitly objected calling for hearsay because it was exculpatory and it wasn't an admission. Based on that, just based on his assertion, I can't conclude anything else than it would have been beneficial to my client. If it was that he found it, it would go directly to the question of whether or not he had intent to distribute. All right, so your point is a little more subtle. You're saying that the officer's admission on the stand implied that the notes would have been favorable, but there is no, would you recognize at this point in the law, statutory duty requiring police officers to preserve their notes. Is that correct? I would say unless there's anything exculpatory in them. So if there's any statement that in any way, based on Brady and even based on the Supreme Court rules, they're saying you must keep the notes in homicides. It does not require it, but it says you have to keep everything. And based on Brady and his project and everything else goes, if there's something that could be exculpatory, you should keep it because you don't end up with issues like this where we have people changing their stories three times based on not even putting a summary. In his intuitive appeal, when you say should, we would then be extending the law. Would we not if we mandated this in non-homicide cases? Actually, this could have been remedied as well. If the notes were already destroyed, there could have been a summary of the statements, which is what the Supreme Court rules calls for, that they should have turned over. They should have said this is what the statement was, here's what we would call it to be. But she's going to argue the summary is in the police report, isn't she? No, because it's not. There's no summary whatsoever. They said there was an initial statement. That's all it says. It doesn't say anything about what it was. And that's innately our problem is there's an initial statement that we still don't know what it was because the officers have testified two different times in two different ways. So identify the specific differences because we've had multiple hearings in this case. We had motions to suppress evidence, motions to suppress statements, and one of them had to be continued. So tell me what the differences are. In the motion to suppress statements, the police officers testified. The initial statement said the defendant told them that he found the cocaine and that they didn't believe him. They told him to tell the truth. That was it. That was the only time they gave any testimony prior to trial. At trial, they testified specifically that my client invented a quinceañera for someone in Rockford. He had an uncle. The uncle gave him drugs, told him to sell them, that he was going to sell them to support his wife who was pregnant and send money back to Mexico. Those two statements are very, very different, specifically just for the purpose of a defense in terms of intent, but also because we didn't have the second one. We couldn't challenge the detective's testimony at the first hearing based on him saying the only initial statement was that he found it. That was new evidence that was only brought up for the first time at trial and was never turned over to us, which we would say is a clear Brady violation because we could have used it for... But they testified well in anticipation of trial at those motions. Exactly. And you knew from the police report that there was the statement that his uncle gave it to him to sell. Yes. No, no, we did not know that statement was there. That was given at trial. Well, that's not the first statement. That's a later statement. That was the statement at trial, exactly. So the first statement was that they found it, and that's all we got. They said they couldn't recall anything more. At the motion to suppress. At the motion to suppress. Nothing was ever turned over in writing based on our motion to produce or our interrogatory. None of that was ever turned over at all. That he found it. That he found it. It was not turned over. But you did have, didn't you, discovery that he said that his uncle gave it to him. No, I did not. There was no discovery whatsoever of any kind that his uncle gave it to him. That was presented the first time at trial. And I believe looking at the record. So which statement do you think is the violation? Both? Both. The first statement, had that been the only statement, and that would have been the issue at trial, it would have been fine. The violation is there's another statement that was never tendered. And there still hasn't been anything that's been tendered in writing which was what was requested in discovery. So we had no way of knowing either way. Well, the trial statement should have, if I'm listening to your argument correctly, and maybe I'm not, the trial statement is the one that should not have been summarized, but it should have been given to you. Yeah, it should have been given to me and or summarized. And in the document that he signed. It is not in there? It is not in there. What does he say in the document he signed? In the document they signed. Where did it come from? The document he signed was, and that's another issue that comes up into this, was after interrogation, they claimed that they told him to say the right thing, and he changed his statement. There was testimony at the motion to suppress that he was coerced and threatened by the detectives. But what did he say? I'm asking you what he said. I know what your allegation is. What did he say that's different than either one of these two? The confession said that he had got drugs from someone in Chicago, and that his intent was to sell them to get money for his pregnant fiancée. Okay, so we've got the difference in who gave him the drugs and where the drugs came from. That's the primary difference. But you said in the statement about his uncle that he was going to sell these drugs to help his pregnant fiancée, or pregnant wife. So it's the place and from whom he received the drugs. Well, it's that it was completely contradictory. They said the first statement was completely different. That's why they didn't put it in the records, and that's what the reports all say. They said the first statement was that he found it, and that that was all they remembered. But because it was so implausible, they didn't even put it in the report. Defined. And that's what we don't know. At the time when they said it, they said it was defined. Yet at trial, they said it was a statement that's off by two or three points, but that they somehow corrected, which we couldn't know about until trial, or else the question would have been asked. Okay, go ahead. One of the key issues you raised, and this deals with the emotion of coercion to suppress evidence, that the problem was initiated because Auxiliary Officer Hayes, who was not a fully sworn formal police officer, initially confronted the defendant in the vehicle, and that's what started the chain of events. Yes. You've alleged that he was an agent of the state in your motion to quash. Yes. Tell us why, in some reform, you believe the evidence establishes that he was acting as an agent of the state. Officer Hayes testified he was a police officer. He testified he was an auxiliary police officer in various jurisdictions. He was off duty. But he does work regularly as an auxiliary police officer. He was doing this in full uniform and the like, and he was attempting to act whatever was in his mind in the furtherance of justice. He was trying to make an arrest. He's been trying to do all of this. He's a member of what's called the Illinois Police Bureau, a not-for-profit organization, correct? Yes. Aside from, you're aware of an attorney general's opinion that says he's not an agent of the state. The Police Bureau is not. And they specifically deal with the Police Bureau, but that's an agency differentiation that doesn't necessarily apply here. If he is an auxiliary police officer, the Police Bureau is a red herring. It doesn't matter who sent him there. Once the state agency hires him, he becomes a police auxiliary. But he's clearly not on duty. He's going home. These people are parked in his parking space. And it's actually on the street near his house. It's not actually in his parking space. All right, well, maybe it's one that he liked to park in. I don't know. But he sees this as he's going home. Exactly. And a police officer off duty doesn't stop being an agent for the state. Yeah, but he's not a police officer. Your first point, you have a very legitimate point. But the second point is, under the statute that governs auxiliary police officers, it states that an auxiliary police officer is only a conservator of the peace, that is, an officer while he's on duty. If he's off duty, he doesn't have any legal authority beyond that of a private citizen. Exactly. But a private citizen isn't – you're not protected against – the Fourth Amendment protections don't apply to the actual private citizens, do they? Unless they use powers that an ordinary citizen wouldn't have. And in this case, identifying himself as a police officer. Well, anybody could have done this. He didn't have to be – you could have gone up to the cargo, you realize. Absolutely. But if – because he has this relationship and he identifies himself as an officer. How did he identify himself? They talked to his officer. He's speaking in front of them on the phone. He goes, this is Officer Haynes. He doesn't say police officer. But he wasn't talking to them. He was talking to someone next. No, he was talking right next to them, though. He showed up in a uniform that has officer on his badge. He has a gun. He has a flashlight. He has a utility belt. He's in a police officer's uniform. Well, how does that bind the state? What if somebody poses as a police officer unknown to anybody? Does that mean the Fourth Amendment applies because somebody perpetrated the fraud? You have case law that says that? No. And if it was completely someone who was unrelated to the state in any way, they've said clearly that that doesn't have anything to do with it. But here we have an auxiliary police officer who's been awarded by the Ballot Delivery Police Department. Except as a matter of law, by the statutory definition, at that moment he was not acting as a police officer. Right. But the exception to that, even as a private citizen would be, he's not allowed to use any powers that an ordinary citizen would not. So if he shows up in a police uniform with a sidearm and a badge as an off-duty auxiliary, so if he's coming back from his auxiliary job, he's still not a police officer. But if he uses any of his tools of the trade, he's all of a sudden jumped the line. And that's what kills us. But how does that bind this? How does he become a state agent if he jumps the line? Because he's always an agent in some way, shape, or form. He's employed by the state. He wasn't working a state job that day, was he? He was not. So he's at least a day or maybe two removed from any state activity through the board, correct? Through the Illinois Police Department. I don't know. It could have been a day. I don't know. Well, he didn't work for any municipality or recognized state entity on the day in question. We don't know. Well, tell me, did the Court of Illinois have some attorney general opinion? It did. And what's your position with respect to that? The attorney general's opinion on this, as I said before, with him being an agent, doesn't necessarily deal with that. There is no case law that says when an auxiliary is off-duty because it says they are a police officer with powers on but not off. All right. They're a private citizen. Off-duty. Right. As is any other police officer. Not necessarily. And that's where the gray area comes in that we don't know what he is. But the attorney general's opinion. He's not. He's working at a security. He's working at security, private security for somebody in his outfit. And the outfit seems to be the problem. Should he have taken everything off, which would have been a little interesting? Should he have taken everything off before he approached the car? He should have gotten rid of his sidearm. So you're looking at it, counsel, from what is in the mind of your client with respect to this individual? Absolutely. That's what the case law says because based on all the search and seizures, an individual that walks up, they would feel that they would have the ability to leave. When a person in a uniform with a sidearm walks up, there is no freedom to leave. Someone was already removed from the car. They couldn't have walked away from the individual. Your case law, and this is really the critical, specific question. Your case law says when the citizen believes somebody to be a police officer, they as a matter of law become an agent for the state even if in fact they have no connection to the state. You seem to be saying that. The connection to the state is as an auxiliary? It's the off-duty part.  If you go with the mind of the defendant, if that was the test, then let's say you have somebody who isn't in any way connected even part-time with the police. He's posing, fraudulently posing as a police officer. According to you, if we adopted your test, that person would become an agent of the state because the defendant's mind, he reasonably believes him to be a state officer. Can you see the problem with that? Absolutely. But here we do have an agency connection, and that's the issue. Any agency connection at all, he knows that he shouldn't be doing this and he's using the powers. And people, V. Carrera said, even if you just walk up if you're from another state or anything else, if you're off-duty and you say, I'm a police officer, you're using your powers when you shouldn't, and that's what taints it all. He didn't pull his gun. He had it on his side. Well, where did you want him to put it? In his pocket? It should have been stored in his truck. He's wearing an outfit that he wore all day. He has a badge. Now, that one would be easy to get rid of, but you're saying he should have gotten rid of his gun. And your client, according to the testimony, was good evening, officer. They have made the assumption, but he never said, until he got on the phone with somebody else, that he was a police officer. Isn't that correct? Right, but he has a giant badge that says officer on it. Yeah, but you said he could leave that on. He just needed to get rid of his gun. Well, he should have gotten rid of some of it. He didn't do any of that. He just walks up as a police officer with a gun. When they say, hello, officer, he goes, uh-huh. His specific testimony was they didn't ask and I didn't tell. Well, that's exactly right. That's what our children do. They didn't say, are you an officer? He should hold them to at least some sort of a standard going, okay, so if he's going to walk up off the street, the defense is he didn't ask and I didn't tell, which is what our children would say. But that's not appropriate for someone who's acting as a police officer at least part of the time professionally. With all due respect to Mr. Haynes, he might be a police officer wannabe, but on this particular occasion, not doing any police authority work that day, I still can't see how he is using authority of a police officer that night. And using the gun that he's given as an auxiliary. He didn't pull it. But he didn't pull it, but just showing it. Do we even know if it was loaded? Maybe he was Barney Fife. He didn't have any ammunition. Can we take judicial notice of that? I wish I knew. I'm saying, and this is an important thing to look at with him, is Mr. Haynes throughout his activities, which the records show, repeatedly represented himself as a police officer. He did it in the courtroom and allowed a gun to show up next to the judge, which wasn't allowed based on local rules and the like. We have someone who's clearly, he was armed. And the judge is supposed to disregard that. We know what the case law is. He didn't show up in front of a jury that way. No, he did not. He was in street, what we'd call street clothes. Right. This has been a very lively, interactive discussion, but the time is over. Do you have anything to wrap up on something you didn't touch on? Can I ask one question, Presiding Justice? Yes, sure. Oh, please. Let me get out of the way. If you have one other issue I would like, I know you have a lot of issues you didn't touch on, and I apologize, but we tend to ask questions more than to allow lawyers to stay on task. But you have one issue that I just wanted you to touch on briefly, and that's the juror misconduct. You indicated that there was a juror that should have been, that the defense attorney should have been allowed to have used a cause challenge for that one particular juror. Yes. How do you equate that conduct of that juror with misconduct? Is this the juror that knew the judge? He knew the judge. He knew the detectives. He knew everyone on the state side. He said he knew the detectives and a witness, but he never mentioned the judge, and that's what you're calling the misconduct? I'm saying that is misconduct as well. He should have been stricken for cause just based on the fact that the two detectives were his clients. But did the defense have one preemptory challenge left at the end of the day? We did. So where is the prejudice? The harm becomes, as a strategy, when you're going in to pull a whole new panel with one challenge, it's a big difference between someone who you will accept before you open yourself up to eight new jurors. If I had two different challenges, it becomes a completely different option whether or not you take a new panel. Did his firm make, or whatever firm that the detectives were clients of, did it make the contribution to the judge, or did he do it particularly himself? The juror did it specifically himself. And how do we know that? Because we found it online based on the donation polls. And what was the dollar amount? $500, which was the maximum allowed by an individual. We're going beyond the time, but I'm curious about the logical point you're trying to make. So the juror contributes to the judge's campaign. So does this mean the judge, how does the judge, if he has a relationship with the juror, influence the outcome of the trial? Is the judge ruling in favor of the jurors now? It would seem the juror has an interest in this. The jurors have testified that the detectives are not only his clients, but his friends. You're talking about the judge. Exactly. And the juror keeps saying he wants to be on this panel. But what's the relationship with the judge you have to do? How does that prejudice the defendant, the fact that the juror knows the judge? How does that prejudice the defendant? Well, the judge, who is now accepting campaign contributions, who has also had this juror as a former client, who has an ongoing relationship with him, is inclined to give his friend what he wants, and his friend wants to be on this panel. There's a conflict. It didn't happen. Right, because I had to use a preemptory that I shouldn't have. And that's the issue. Then you would have had two left. Exactly, which would have made a big difference in looking at another six jurors. All right, counsel, your time is actually up, and you'll have your rebuttal time. Thank you. Ms. Kripke. May it please the Court. Joan Kripke on behalf of the people of the State of Illinois. Counsel, I have a couple of corrections to make before I, on my part, and then I have a lot of corrections to make in regard to what the defendant just said. More on his side than your side, right? I'll let you count.  In the line of my brief, Florida v. Bostick, the pinpoint site should be to page 434. On page 30 in the indented paragraph, the site to U.S. v. Siegel, the page starts on 840. I don't remember what I had. In argument one, I said that it was waived because they never asked for the oral statement, and I really made a huge effort to comb the discovery. I am in error because they put it in their reply brief. They did ask for the oral statements in their discovery, so it wasn't waived. And if I have time to get to it, I misinterpreted Coolidge v. Hampshire, but actually the error is in my favor. I just misread the case. All right, let's talk about these statements. Okay. The people disclosed to the defendant on, I think it was December 16th, was it 2011? I can't remember when this case took place, that they had an oral statement. And that is in compliance with Supreme Court Rule 412. What was not in compliance with 412 was the fact that they didn't say what the statement was, and they were required to have done that. And they didn't. To summarize the statement. They were required to summarize the statement. They didn't. That's error on the part of the state. However, in this case, it was harmless error. Why was it harmless error? In February, the defendant came before the court. They were talking about what was missing from the discovery. Never said, where's this oral statement? Still, the burden was on us to produce it. However, when we finally get to the motions to suppress statements, which were held in April, the ruling was in April. And the trial didn't take place until June 20th. So you have all of May, and I think most of April. And I'm not sure if the motions to suppress was held in March or in April. But anyhow, the ruling was at the very beginning of April. So you have almost two April. It was continued April 5th, and a ruling was April 12th. Okay. I'm not sure. I thought one of them was April 6th, but I can't remember right now. But it was at the beginning of April. Ms. Kripke, motion to move on motions to suppress one statement. So that was it. A motion to suppress the defendant's statements. And during that hearing, during the suppression hearing, I believe it was Detective Berry testified that the defendant said to them, well, I found the cocaine. And his response was, you know, we said to him, we just don't believe you. There is no cocaine fairy leaving cocaine around. Tell us the truth. That was known at the suppression hearing. However, in the ensuing two months, or almost two months until the trial, the defendant never made a motion for the state to turn over any other statements or to make it more complete. Basically, Brady, is it his burden to make that motion? Is it his burden? Yes. Well, first of all, Brady doesn't apply to any of this because it's not exculpatory. What is exculpatory about I found the cocaine? It's not exculpatory? Well, if you find cocaine, do you keep it? I wouldn't, of course. And this is being recorded, by the way. So for the record, I certainly wouldn't. Okay. Well, that's encouraging. Okay. Hypothetically, I mean, that is not an exculpatory statement. Indeed, if you found it. He didn't say, I found it in my car. Well, it could be. I mean, that's a parse of words. It could be a transitory. You know, possession doesn't necessarily. Possession has to be the intent to have control, intent to have dominion. So if you stumble upon something in the street, are you in possession of it? No. Okay. But also, the implication is he found it in his car because that is where it was discovered. So your argument on that is, look, it's not exculpatory, so there's no Brady violation. That's not a Brady violation because it's not exculpatory. So what did he actually confess to? So then he confessed that someone gave him the cocaine to sell to help his wife. That is not exculpatory. How about the statement that his uncle gave him the cocaine? I don't care who gave him the cocaine. So if they change it from my uncle to someone, I got it at a quinceanera versus I got it in Chicago, does that really matter? Someone gave it to him, and he said, well, I took it from this person that gave it to me in order to sell it for my pregnant wife. Doesn't it go to the credibility of the police officer, go to the weight of the police officer's testimony? It would in this case. So isn't the fact that those statements weren't turned over detrimental to the defense? But if he made the statement in his written statement that I was given it, then it was incumbent upon defense counsel to impeach him. What do you mean you were given it? Was it in Chicago? Was it at a quinceanera in Rockford? Who gave it to you, an uncle or somebody else? That was his job once they were at trial because he had the written statement from the defendant. But he had a third statement on the stand from either Officer Berry or was it Officer Gardner? I can't remember. That's the one he should have impeached him with if it didn't match up to the written statement. Did they impeach him with them at all? I don't recall. And that's the defendant to impeach him with. The line is why would the state not provide that information when you know, I mean, whether you decided it's exculpatory or not, it's the judge's job to do. And you don't just say, well, I don't think this really applies, so I'm not going to produce it. But they produced a statement at the time of the suppression hearing. He was then a no-sign. Well, it's not the last one. But the last one was in the written statement. It's how they changed it. The written statement said I was given the cocaine in order to sell it. In Chicago by somebody. Okay, so now the man's on the stand, whichever of the detectives it was, and he said, oh, the defendant told me he was given the statement at the quinceanera to sell by somebody else. His uncle. Okay, whoever. So that does not match up to the written statement. So that's not something we necessarily had. I mean, maybe the detectives. Who necessarily had? We the police, we the state, had two statements. One, the oral statement, which we did not turn over, but was made known to the defendant at the suppression hearing. He did not at that point say, really, there was an oral statement? I want a summary of it. Where's the rest of the oral statement? Isn't it incumbent upon the prosecutor to question their witnesses before putting them on the stand and make a determination during questioning of the witness as well as during discovery to go to the police and say, is there anything else? Do I have everything? Isn't that incumbent upon the prosecutor to do that? Yes. But where is the harm in this? And, in fact, we put it in our discovery. We said there was an oral statement. Was it error on our part that that statement, I found the cocaine, was not summarized and given to them ahead of time? Yes, it was error. It's in violation of the penal law. Let me summarize the points so you can move on, okay? Okay. This is Shostak's legitimate point. I think Brady does stand for the proposition that it's incumbent upon the state to tender this irrespective of whether or not anybody makes a request for it. But what you seem to be saying is, okay, that didn't happen here, but prior to the trial, it was, in fact, disclosed to the defendant. It was not sandbagged. That information came out. They could have followed up. They didn't. So you're saying where is the prejudice to undermine the trial? Is that basically what you're saying? Thank you for that summary. Let's get to the next point. Okay. So the misconceptions that were actually kind of astounding to me that were given during the oral argument regarding how Mr. Haynes, how all of this took place. First of all, Mr. Haynes was not working as an auxiliary police officer on that night. He was in uniform from SPI, Securities Professional of Illinois or whatever it is. Mr. Safar repeatedly said he was working as an auxiliary police officer. He was not. Well, he had a gun. He had a star. And as an auxiliary police officer, he is not allowed to wear the uniform or have the gun on unless he's on duty. And he was not on duty. How does the defendant know that? He was coming home from his job at SPI. Coming home from his job, going to the job, he is, A, allowed to wear the uniform, B, allowed to have the gun on him. How does the defendant know it? The defendant doesn't know it. But it's not the subjective interpretation of what the defendant thinks. And so we have to look at it from two different angles. You can't mush these things together. Why was he interested in his car? Well, let's say, first of all, it was in his parking spot. This is the bottom line. It's in his parking spot, and it's midnight, and he wants to park there. But the car is running, and the windows are fogged up. Could be a lot of things. Maybe somebody came in there, pulled their car, and he doesn't recognize the car. It's never happened before. What if it's someone driving down the street who is having a heart attack and has parked the car and is alive in that car? Does anybody not have the right to look and see? Certainly a police officer would under the community caretaking said they should look inside their car and see what's going on. It's just running. Allegedly he can't see inside of it, so he shines a flashlight inside. Defendant rolls down the window and says, hello, officer. It's not incumbent upon him to correct that or not incorrect that. He is a citizen going down the street. People call me all kinds of things, and I don't necessarily correct them when they say Mrs. Kripke to me. I'm not married. I don't use that appellation. I don't necessarily correct people depending on the situation. And he certainly had no obligation. So as an ordinary citizen, he's walking down the street, he sees a suspicious vehicle, and when the defendant engaged him, he said, what are you doing here? And the defendant said, we're just sitting here drinking beer. Boom. That's a violation of a state statute. You cannot be on the public way in a vehicle, motor running or not, with open package. Did he have the right to make a citizen's arrest? Absolutely. So he could have made the arrest for a misdemeanor violation, irrespective of the reason. I'm sorry. But I mean, it wasn't an ordinance, was it? It's not an ordinance. It's a state statute. So the state statute allows him to make a citizen's arrest even if he's not in uniform. Correct. If you don't have a uniform, you or I could go and do this. All right, but he detains them. He detains them. But why does he ask to go in the car? Excuse me? Why does he ask to go in the car? They just told him something. Call the police. Now it's time to call the police. Okay. So under U.S. v. Siegel, why he wants to do it, as you said, he's a wannabe cop. Whatever. He said, can I search your car? I mean, this may be dumb, but they said, sure. Whether or not they were intimidated, they thought he was a police officer, irrelevant, because he is not acting as an agent of the state, and their subjective perception of what he is doing. It's not my mistake. It's irrelevant to what's going on here. So now when he searches the car and he finds evidence of the drinking and he finds the cocaine, then if you look at Siegel, then he calls 911 and says, I have this situation here. Siegel says that a person who is not an agent of the state who does a search and finds evidence of a crime, if they have not been instructed by the state or told by the state to do this, it's not a search that can fall back on the state. Wasn't he advised what to do after he called 911 by the state? But at that point, the search was complete. Well, then why did the other officer, when she came, did she ask permission to? She didn't have to, and here's the reason why. I mean, you have to look at it in two ways. If you're saying that he's not an agent of the state, under Siegel he had the right to search. The search does not fall back under the state's aegis because they never told him to do that. If you're going to say he was an agent of the state, then he had probable cause to stop and see what was going on. There's a car that's running, suspicious vehicle, doesn't know what's happening. The people talk to him and tell them that they admit to committing a crime right there. They have a violation of the state statute. So therefore, as a search incident to arrest, he had every right to search that car. Now, if you're going to look at him as not an agent of the state, once Officer Bogdanov showed up, did she have the right to search the car incident to arrest? Yes, she did. Did she place them under arrest when she got there? Yes, she did. She separated them. I'm not sure when they were placed. The girls were put into one car. The boys were put into two other separate squad cars. So the question then comes under Gantt. Are they within arm's reach of the interior of the car? Clearly not. But there's an or part to Gantt. And the or under Gantt says, or there's a reasonable presumption that there's other evidence of the ongoing crime there. And since Mr. Haynes is not a police officer, and despite the fact that he conducted a search, he's not a police officer. So she has the right, incident to arrest, to search that car. When they gave the consent to search to Mr. Haynes, is it relevant whether or not they thought he was a police officer? No. Well, if I walked up without my robe and said, well, you're in my parking place, can I look inside your car? Most people would say something I will not say on this record because it is being recorded. So why did they say yes? Oh, I think, I mean, is it off record? No idea. But I think, I don't know why, because they were scared because maybe they didn't think they would find the cocaine because it was in the pockets. And he didn't indeed find the cocaine that was in the pockets of the car. He only found the one that happened to roll out. So you think that whether it's somebody who's in everyday clothing, a pair of khakis and a button-down shirt versus this Mr. Haynes dressed in a police uniform, that if either one of them asked this individual, can we search your car, he would have said yes because he didn't think they'd be able to find anything? I don't know what he would have said. I think it's irrelevant. You do? I do think it's irrelevant because the question is, you have to take it back. I mean, you can't go down the garden path on this argument. Either you determine he was an agent of the state or you determine he was not an agent of the state. That's what you have to do first. Once you make that determination, it's irrelevant what these people thought. If he was an agent of the state, the state had every right. He, as Mr. Haynes is an agent of the state, had every right to go in there and search. If he's not an agent of the state, if they want to let this guy in their car, that was their bad luck. I mean, why did they also tell him they were drinking in the car? Why would someone admit to doing that? My guess would be because you tell them you're drinking, you think, I'm not driving, what could be the problem? And it covers up for the fact that you also have cocaine in the car. But that's also not a record. We've heard the time, and we have a slight exigent circumstance today, so we do have to get this finished on a timely basis. If you could hit summary, and we'll let Mr. Safaree have his couple of minutes, and we'll move on. Also with the intent to distribute the cocaine, that's determined also by the way it was packaged, by the fact that it was in eight or ten or possibly 11 different packages. That shows the intent to distribute. Something you didn't cover in your brief, because I believe that was covered in your brief. You did submit to us a leave to cite an additional case. And the Anderson case that you cited, it just came down. You're citing that for the proposition of change of weight? Not change of weight, but it's just a different, it talks about the chain of custody and when something is admissible and not admissible. And what I'm saying is it goes to the, not the physical weight, but the weight of the evidence and not to its admissibility in this particular case. As to the juror misconduct, first of all, Mr. Safaree said everybody on the state's side was Dr. Chapko's client. It's not true. Or patient. It's simply not true. Leon Berry testified that he was. He said, excuse me, Detective Berry is my patient. They didn't ask him about the judge. Whether it was incumbent upon the judge to say anything is different from what's incumbent upon Dr. Chapko to say. The other thing is, let's say the defendant makes these allegations in his brief that Dr. Chapko could have tainted the jury from all the time he spent with them. Well, that would be true of anybody. A peremptory challenge is used. It's a gasoline, someone's dismissed for cause. We don't know how much time that person spent with the jurors who were eventually impaneled. If you did that, you would always have juror misconduct. And misconduct comes with someone who's actually impaneled. This person wasn't doing anything. He was on the panel. I mean, we can't, there's nothing of record telling us that this happened. And so we would ask the court to affirm the convictions here and to find the. Thank you. Thank you. Mr. Safar, we do have to hold you to your time because we do have a circumstance that needs to be addressed. Absolutely. I will hit a few points real quickly. It wasn't a parking spot. It was a street in front of a condominium thing. It was a public street. There is no parking spot. I just wanted that to be out there. But he said it was his parking spot. Was there a recliner out in the space? No, no. He said it's where he usually spots. It's not even city of Chicago. Recliner. Recliner, folding chair, the like. It's just a spot on the street where it was somewhere near his home. Okay, but he said it was his and that's the record. So let's move. He testified he couldn't see into the vehicle because it was so fogged, but yet he could see everything inside. It was an arrest by a private citizen and then a search. If he put them under the arrest as a private citizen, we don't know when the police officer bugged on us. As you asked, put him under arrest. She did not get consent to search the vehicle. They were not under arrest based on her. And if we're going to let a private citizen place them under arrest based on Gant to then allow a subsequent search, that's opening a different door that I don't think anyone wants to touch that a private citizen can walk up. And now the police can go search their vehicle, their home or the like subsequent to an arrest by a private citizen. We don't know if they were under arrest. They were taken away. They were put in a car and then she searched the car without a warrant based on Gant. There was no reason to do so. They were away. They were gone. Everything was out. She was told that it was evidence at that point or she had some indication at that point that there might be evidence of a continuing crime. The only thing she had was a 12 pack of beer sitting on the roof that was completely full. So if based on her assertion, he was arrest based on the consumption of alcohol with the empty bottles and everything else. Everything was on there. There was no reasonable suspicion of anything else. She had all her evidence. It was all there and packaged right on top of the roof. With Officer Bogdanas, the issue that wasn't brought up on the first issue was whether or not missing drugs is a per se tainting. And I just wanted to touch on that real quickly because what we have here is based on all the testimony, Officer Bogdanas counted these baggage. Detective Barry, other officers, she testified. Everybody triple counted these baggage. There's 11 baggage. It gets to the crime lab, there's 10. Per se, it's tainted. There's something missing. This isn't an issue of weight as the case counsel mentioned before would indicate. It's not about how heavy your children are. It's how many they are. And there's a big difference between 10 and 11. But the fact that one is missing is kind of good news to your client because that could have put him over a threshold. It's not because we don't know the big issue with all of this is can it be reliable? And it can't because it's missing. Saying that all of a sudden we took a few out makes it better for you is a great argument to say, well, you shouldn't care whether or not we're accurate in our job. But I don't know what happened to the bag. I don't know if someone took something out of the bag. I don't know if someone put something in the bag. Or if she miscounted it. And she testified that everyone else counted it three times and it was 11. So if all these police officers who is specifically at this point their job to count this, this isn't one of the minute things that they're supposed to be doing. Counting the baggies is really important. And we can't, you cannot count on the evidence then. Because if they say it was there, something's missing. Missing one thing might seem like a very small issue with regards to weight. But missing one child, missing one wheel on your car. Missing one can be very significant. In this case, the quantity dictates that something happened to this evidence. And based on that, there was no showing that it's the same evidence. And if it's not, then there's an issue. And we can't trust that. All the cases in dealing with the voir dire, which with the judge and if there's juror problems, the Supreme Court is dealing with it saying that if there's anyone who's donating to a judge's campaign right now, they're trying to change the rules to make sure that they have to disclose it. He should have. It was a client. It wasn't just somebody he knew. But the rules didn't require him to. They didn't require him to at the time. How did he, we don't, do you have to know someone to contribute to them? You don't, but the judge said he did. The judge said he was his attorney. He took money from him. But that was a while ago. It wasn't yet. He says he's still my dentist. I mean, it was an ongoing relationship. As I said when I started, it's the right to a fair trial. So, wait, I just want to get this straight. So you're saying if a juror knows the judge and the judge knows the juror, then there's a, then the judge should recuse him for cost. It should just be disclosed. You shouldn't wait until after the trial. It doesn't mean you have to start all over and reinvent the wheel. But it's something that should be out there. So if there's an issue, then it can be dealt with at the time as opposed to after the trial when we're finding all these things out. Well, he disclosed that he knew people. He knew the detectives. But he didn't say that he knew the judge who was ruling on whether or not he could be involved or not. Well, once again, it's the question that was asked. And we have to, we do have to leave. So if you would please summarize, we will proceed. I would say in the briefs there were 11 issues, any one of which would be grounds for another trial. When you look at all of them combined, all of the issues, whether statements were missed, whether warrants were supposed to be gotten, whether coercion existed, whether evidence was tainted, you, with all of it, you cannot have a fair trial. And that is what the imbalance rights demand, was a fair trial, not an attempt at it. Thank you, counsel, for your arguments. We will make a decision in due course when we stand in recess.